299 P.2d 126

**NEVADA TRAILER FINANCE COMPANY, Inc.,**
**and**
**Idaho Trailer Finance Company, Inc.,**
Plaintiffs,
v.
**STATE TAX COMMISSION OF the State of UTAH, Defendant.**
No. 8436.

Supreme Court of Utah.
June 25, 1956.

White, Arnovitz & Smith, Salt Lake City, for plaintiff.

E. R. Callister, Jr., Atty. Gen., Ben Rawlings, Rex W. Hardy, John G. Marshall, Salt Lake City, for defendant.

WORTHEN, Justice.

This proceeding was instituted to review the decision of the State Tax Commission's determination that plaintiff corporations were doing business in the state of Utah within the meaning of Sections 59–13–1(5) and 59–13–3 Utah Code Annotated 1953, and denying the protests filed for corporation franchise tax deficiencies for the years 1951 and 1952. The plaintiff corporations were incorporated in the states of Nevada and Idaho respectively in 1951.

The declared object and purpose of both finance companies was to purchase conditional sales contracts from the sellers of house trailers in the states of Idaho and Nevada. The finance companies collected the principal and interest due on the contracts. The Idaho company purchased contracts from Idaho house trailer dealers and the Nevada company purchased its contracts from Nevada house trailer deal-

ers. The Nevada company maintained a bank account in a Las Vegas bank during part of the period involved, while all of the banking for the Idaho company and most of the banking for the Nevada company was done at a Salt Lake City bank.

The original contracts covering the trailers were assigned to the finance company and forwarded to the office of the company located in Salt Lake City, Utah. The contracts were inspected by Mr. Max Siegel, manager of both companies, who issued a check to the seller of the trailer in payment for the contract. Account cards on all contracts are made up in the Salt Lake City office of the companies, and the original contracts are retained in a safe deposit box in a Salt Lake City bank. Monthly installment payments are generally sent to the company offices in Salt Lake City, although some payments are received at the office of the trailer selling agencies in Idaho and Nevada, and the money and record of payment are sent to the Salt Lake City office of the companies and said payments are credited on the account cards.

Substantial bank accounts are maintained by both companies in Salt Lake City with large deposits being made almost daily. The muniments of title on the trailers are retained by the companies in Utah as security until the contracts are paid. The following activities of the corporations are carried on in this State:

1) The officers, directors and manager of both corporations are residents of Utah.

2) Although some directors' meetings had been held in Las Vegas, gradually all such meetings were held in Utah.

3) The corporations discount contracts to Utah banks; and negotiate loans in Utah.

4) The corporation books and records are maintained here.

5) The corporations have legal counsel and auditors in Utah.

6) Neither corporation maintains offices outside Utah and neither has employees outside this State, nor does either corporation own real or tangible personal property situated outside this State.

7) Correspondence aimed at securing payments on the contracts goes out from the Utah office.

Upon the foregoing facts the Tax Commission found that the two corporate plaintiffs were doing business in Utah during the years 1951 and 1952, and the Commission assessed a deficiency tax against plaintiffs.

Neither corporate plaintiff has qualified to do business within this State.

Section 59–13–3, U.C.A.1953 provides:

"Every bank or corporation * * * for the privilege of exercising its corporate franchise or for the privilege of

doing business in the state, shall annually pay to the state a tax * * *."

Section 59–13–1(5), U.C.A.1953 provides:

"The term 'doing business' includes any transaction or transactions in the course of its business by a bank or corporation created under the laws of this state, or by a foreign corporation qualified to do or doing intrastate business in this state, * * *."

Section 59–13–20, U.C.A.1953 provides the basis for determining what portion of the net income of a foreign corporation doing business within this state is assignable to business done within this State.

In Utah State Tax Commision Corporation Franchise Tax Regulation Number 8, dated September, 1953, it is stated:

"To determine the portion of net income assignable to business done in the state of Utah, for the purpose of fixing the corporation franchise tax payable by corporations doing business in the state of Utah, it is necessary, according to the provisions of section 59–13–20, Utah Code Annotated 1953, to allocate directly certain income. Subsections (1) and (3) of this section read as follows:

" '(1) Rents, interest and dividends derived from business done outside this state less related expenses shall be be allocated to this state.'

" '(3) Rents, interest and dividends derived from business done in this state less related expenses shall not allocated to this state.'

"These two subsections allocate directly to Utah all rental, interest or dividend income derived from business done in the state of Utah by the taxpaying corporation.

"Where a corporation's business consists in investing money in rental properties, loans or securities, and in receiving income from such investments, the business which gives rise to this income is considered to be done in the state where the investment activities take place. Thus, where a corporation received income from rental properties, or from security investments, the business giving rise to this income is considered to be done in the state *where the corporation maintains its chief place of business, holds its directors' meetings, maintains its bank account, keeps its books and muniments of title, pays its salaries, collects its rents, and carries out all other activities incident to its investment business. If these activities are distributed throughout several states, then the business is considered to be done in the state where the most important activities take place.*

"Where a corporation (foreign or domestic) has its chief place of business in Utah, there is a strong presump-

tion that all rental, interest or dividend income derived from its business activities is allocable directly to Utah. This presumption can only be rebutted by the taxpayer's making a positive . showing that a substantial portion of the business factors discussed above were physically located outside the state of Utah. If, after applying the above tests, it cannot be ascertained that rents, interest and dividends are derived from business done in any particular state, it will be presumed that such income is derived from business done in the state of incorporation." (Emphasis added.)

 We think this regulation reasonable and that the Tax Commission could not, in applying the same, reach any conclusion other than the one announced. This court in the case of J. M. & M. S. Browning Co. v. State Tax Commission,[1] at page 466 of the Utah Report and at page 997 of the Pacific Reporter, said:

"Unless it were made to appear that the petitioner was also conducting an investment business (doing business) in another state all of its net income from its investment business done would be correctly allocated to Utah."

The case of Emerald Oil Co. v. State Tax Commission[2] considered a domestic corporation leasing oil lands in Colorado. The company held title to oil lands in Colorado, paid a corporation franchise tax in that state, had a process agent there and its officers frequently made trips to the lands in Colorado to verify and measure the oil produced and compare the barrels shipped from the field with the barrels received by the refinery, to determine if the lessee was drilling the wells required by the lease; to determine location, depth, and quality of wells drilled; to examine the condition of a warehouse and to determine if there was any trespassing, and to confer with Colorado authorities on tax problems.

We said at page 383 of the Utah Report and at page 775 of the Pacific Reporter:

"* * * At Vernal the following business activities took place: (1) All directors' meetings (normally monthly) were held in the Uintah State Bank. (2) All expenses were paid from the Uintah State Bank. (3) Dividends were distributed from Vernal. (4) The corporation bank in Vernal. (5) The corporate books, muniments of title and the leases with Equity Oil Company were kept in Vernal. (6) Policy discussions were held in Vernal at the regular meetings of the board of directors. (7) All royalty receipts were received at Vernal. (8) Both leases with Equity Oil Company were executed at Vernal. (9) Correspondence, management, and clerical activ-

1. 107 Utah 457, 154 P.2d 993.

2. 1 Utah 2d 379, 267 P.2d 772.

ities connected with the leases were normally conducted in or from Vernal. All of the aforestated activities have received some recognition as factors to be considered in determining the location of 'business done.' "

We are of the opinion that the activities of plaintiffs were as fully localized in Salt Lake City or to even a greater extent than those of the Emerald Oil Company were localized in Vernal.

Plaintiffs contend that the business done in the state of Utah is only incidental to the business done outside the State; that a binding contract was made outside the state of Utah. It is undoubtedly true that binding contracts (conditional sales agreements) for sale of trailers were made outside this State but the plaintiffs were not parties to said contracts. The only contracts or agreements made by plaintiffs were the contracts to purchase coupled with the assignment of the security covered by the same. The dealing in the trailer conditional sales contracts and the purchase of the same by Mr. Max Siegel was the business of plaintiffs and the proceeds from their payment constituted the business. The business was done in this State and the activities of plaintiffs with reference to the trailer title retaining notes constituted the basis of plaintiffs' investment activities. The taking of conditional sales contracts on the trailers sold in Idaho and Nevada was not plaintiffs' business. The purchase of said contracts and the collection of the same constituted plaintiffs' business. The contracts were mailed to Mr. Siegel at Salt Lake City, and although generally accepted, counsel for plaintiffs conceded in oral argument that had Mr. Siegel not consented to accept the contracts when submitted to him, the deal would not have gone through. It was likewise admitted that Mr. Siegel only could draw checks against the bank account of the Nevada corporation during the time one was maintained there.

It is apparent that Mr. Siegel had not only the final say as to the purchase of the trailer contracts, but he also had complete control of the purse strings. It is further apparent that the investment capital was in a Salt Lake City bank drawn on by a resident of this State with the books, records and muniments of title in this State. We are of the opinion that plaintiffs, during the period in question, were doing business in this State and were subject to the tax imposed.

Nor are we impressed with plaintiffs' argument that these corporations must be qualified to do business in the state of Utah before the State Tax Commission has any authority to demand that returns be filed and taxes paid since their doing business under the circumstances is unlawful. We cannot concede that plaintiffs may

avoid their tax obligations by violating our statute as to qualifying to do business.

In People v. Tropical Fruit Corp,[3] the defense there urged was the same as the defense urged here. The court held that the foreign corporation could not escape liability for the tax on that ground and observed:

"This corporation should obtain no advantage over other foreign corporations legally doing business in the state by failing to comply with the terms of the statute."

Affirmed. Each party to bear own costs.

McDONOUGH, C. J., and CROCKETT, HENRIOD and WADE, JJ., concur.

**3.** 223 App.Div. 864, 228 N.Y.S. 189, 190, affirmed, 252 N.Y. 605, 170 N.E. 160.